Filed 2/18/16  P. v. Meraz CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B260497 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA090871) |
| v. | |
| JORGE ESTEBAN MERAZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Jared D. Moses, Judge.  Affirmed as modified.

Gloria C. Cohen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Garett A. Gorlitsky, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In an information filed by the Los Angeles County District Attorney's Office, defendant and appellant Jorge Esteban Meraz was charged with first degree residential burglary, person present (Pen. Code, § 459, count 1),[1] first degree residential burglary (§ 459, count 2), and attempted first degree residential burglary (§§ 664/459, count 3). As to all counts, it was further alleged that appellant had suffered three prior strikes (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), had suffered two previous serious felonies (§ 667, subd. (a)), and had served three prior prison terms (§ 667.5, subd. (b)).

Appellant pleaded not guilty and denied the allegations. Trial was by jury. The jury found appellant guilty as charged.

In a bifurcated court trial on appellant's prior convictions, appellant admitted, and the trial court found true, all prior conviction allegations.

Appellant's motion[2] pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 was heard and denied.

The trial court denied probation and sentenced appellant to 105 years to life in state prison as follows: 25 years to life on count 1, plus 10 years for two prior serious felonies; 25 years to life on count 2, plus 10 years for two prior serious felonies, to run consecutively; and 25 years to life on count 3, plus 10 years for two prior serious felonies, to run consecutively. He was awarded 456 days of presentence custody credit, consisting of 397 actual custody days and 59 days of conduct credit. The trial court also imposed various fines and fees.

Appellant timely filed a notice of appeal. On appeal, he argues: (1) His sentence amounts to cruel and unusual punishment in light of his mental illness; (2) The evidence is insufficient to sustain his 1993 conviction as a serious felony, so it should be stricken; and (3) The abstract of judgment must be amended to correct clerical errors.

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    Attached to the motion was a psychiatric evaluation of appellant prepared in August 2014 by Dr. Suzanne M. Dupee. She opined that he presented with a diagnosis of schizophrenia, which had been untreated at the time he committed the crimes.

2

# FACTUAL BACKGROUND

## I. *Prosecution Evidence*

At around 11:00 a.m. on September 6, 2013, Elena Valencia (Valencia) was at home in Monterey Park. She was in her son's bedroom when she heard the doorbell ring multiple times. Valencia went to the front of the house and looked out the window. She went outside the front sliding glass door but did not see anyone. She heard noise by the trash cans near the garage. She was afraid and went back inside the sliding glass door and closed it. She turned toward her dining room and saw appellant standing there. Valencia, "scared and angry," asked him, "'What are you doing inside my house?'" Appellant started shouting at Valencia to open the door. Appellant was sweating and screaming. She opened the door and appellant tried to leave, but he was stopped by the front gate. Valencia opened the gate and appellant "took off running." Valencia ran toward her son's room to get her cell phone, but it was no longer there. Also, the screen on her son's bedroom window was out of place.

Valencia ran out to the street and saw her next-door neighbor, Gina Casillas (Casillas). Casillas had seen appellant walking across the street. He disappeared from her line of sight "[a]nd, typically, because [she] live[s] on a curve, if someone was going to continue heading down towards the shopping center, they'd come back into view. And he never came back into view." Casillas kept looking and then went into her backyard to see if appellant had climbed the fence to take a shortcut to the shopping center. Casillas did not see anyone so she went out of her front door. Once outside, she saw appellant coming out the front gate of Valencia's house. Casillas saw Valencia, who told her that appellant had been inside her house. Casillas went back inside her house to get her cell phone and car keys and drove to follow appellant. She also called 911.

At the same time, John Flores (Flores) was at his home on the same street. He was in his bedroom when he heard his doorbell ring repeatedly. As he walked towards the door, he heard his door shaking as if someone was trying to open it. Flores opened the latch to a six-by-six inch window in his door and saw appellant, who he had never seen before. Flores said something to the effect of, "'Yes. Can I help you?'" Appellant

3

looked at Flores, appeared scared, eyes opened, and was "fidgety." Appellant said, "'Do you know where Riggin Street is at?'"[3] Flores knew that Riggin Street was in the neighborhood, a few blocks away. Flores replied, "'Yes,'" and pointed in the direction of Riggin Street. Appellant said, "'Okay,'" and "was fidgeting and he started walking away and looking back at [Flores] and then he left."

Flores, an off duty police officer, found appellant suspicious. He got into his car and drove down the street to see if appellant was knocking on other doors. Flores came upon Valencia and Casillas on the sidewalk talking to each other. Valencia was crying and appeared scared. Flores stopped and asked Valencia what had happened. They told him that a man had broken into Valencia's house and that he went south down the street. Flores called 911 and continued driving south to find appellant. Flores told the operator that he was following a burglary suspect. Flores drove a couple of blocks and saw appellant running. Flores followed him. Appellant continued running until he saw a different car, following him, at which point he jumped a fence into the yard of a house on that corner. In the other car were Casillas and Valencia. Casillas saw appellant jump over the wall entering the backyard. Flores told Casillas and Valencia to stay at that corner to watch for appellant while he kept an eye on the alley behind. The police arrived and Flores informed the officers what he had covered as far as the perimeter.

Officer Vincent Vasquez was one of the first officers to arrive at the scene. He spoke with Valencia and Casillas and determined that a search of the area needed to be conducted. Officer Vasquez set up a perimeter. Officers went door-to-door, speaking with residents and, going into their backyards, looking for any signs of forced entry.

Officers knocked on the door of a house on Hammel Street. Appellant opened the door. Officers initially believed appellant was the actual homeowner. Officers told him that they were conducting a burglary investigation in the area and asked if there was anyone in the house, if he had seen anyone, and if he could bring in any pets because they

---

**3**    The parties stipulated that appellant was living on Riggin Street at the time.

were going to search the backyard. Appellant said that the officers could go in the backyard and that he would brings the dogs in.

Officers informed the command post that they were speaking with a person at this particular residence and were about to initiate a search of the residence. A supervisor communicated back that the residents (Arthur and Sylvia Ramirez) were at the command post and that no one should be home. Officers sent the Ramirezes to the residence to ensure that it was in fact theirs and that no one should be in it. Mr. Ramirez confirmed that no one should be in the house. He also told officers that there were multiple unsecured firearms in the residence, including a high-powered rifle.

Meanwhile, officers returned to the front door, asked appellant if they could see his identification, and asked if they could speak with him outside. Appellant said that he was not part of any of "the business" and was not going to come outside. Officers asked again. Appellant said that he had his liberties and that he was not going to step out. Officer Vasquez then told him to "'open the door.'" Appellant said "'No'" and slammed the door shut.

Officers pulled back and called in the SWAT (special weapons and tactics) team. The SWAT team set up containment with armored vehicles. Officers made an announcement, telling appellant to surrender. They also called the phone in the residence and shot rubber bullets at the front door and flash bangs to gain his attention. Appellant did not answer. Officers then used a "'throw phone'" in an attempt to establish communication with appellant. Appellant did not pick up. None of the attempts to communicate with appellant was successful. Officers shot canisters of tear gas into the residence in an attempt to have appellant exit. Appellant did not come out.

Officers broke down the front door and the SWAT team entered the residence with a canine unit. Officers cleared all of the rooms but did not find appellant. Officers noticed that the attic access door panel in the ceiling had fresh marks and dirty fingerprints on it. They used a "pole cam" to search the attic to see if appellant was in there. Officers noticed that the fiberglass insulation had been moved. They then sent Canine Max to search the attic. Canine Max alerted that a person was in the attic and

Canine Max bit appellant. Officers then entered the attic, saw appellant, and told him to crawl toward the officers. Eventually, appellant crawled toward the officers, who released the canine, handcuffed appellant, and brought him down from the attic. The process to arrest took about 10 hours and multiple air units were used.

After appellant was arrested, Flores identified him as the person he saw on his front porch and who he followed down the street. Valencia identified him as the person she saw in her dining room.

Officers returned to the residence the next day and found a pillowcase full of jewelry and coins and three water bottles in the attic in the area where appellant was hiding. Mrs. Ramirez identified some of the items as hers. Mr. Ramirez identified some of the items as his. The pillowcase was the Ramirezes' daughter's pillowcase. They did not know appellant and had never seen him before.

The Ramirez house was severely damaged as a result of this incident.

Detective Gil Alvarez testified that a common trend for burglaries at the time was "knock-knock burglaries, where individuals knock at a residence and determine whether someone's home. If not, then they usually make entry from the rear of the residence." He opined that it was "very common" that a burglar not have tools, gloves, or mask.

II. *Defense Evidence*

Appellant did not offer any evidence.

## DISCUSSION

I. *Appellant's sentence is not unconstitutional*

### A. Legal Principles

A sentence is cruel or unusual under the Eighth Amendment to the United States Constitution if it is "grossly disproportionate to the severity of the crime." (*Rummel v. Estelle* (1980) 445 U.S. 263, 271; *Ewing v. California* (2003) 538 U.S. 11, 21.) A sentence is cruel or unusual under California law if "'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' [Citation.]" (*People v. Norman* (2003) 109 Cal.App.4th 221, 230.) In making that determination, courts consider the nature of the offense and offender, and

6

compare the sentence with sentences imposed for more serious crimes in California and for the same crime in other jurisdictions. (*Ibid*.; see *In re Lynch* (1972) 8 Cal.3d 410, 424–427.)

The analysis under federal constitutional law is virtually identical to the analysis under state law, and "the federal Constitution affords no greater protection than the state Constitution." (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510.)

B. Analysis

Applying these factors, we conclude that appellant's sentence is constitutional.[4] He committed a first degree residential burglary with a person present, a first degree residential burglary, and an attempted first degree residential burglary, crimes that are undoubtedly serious and offensive. Making matters worse, when appellant was caught, he refused to surrender, requiring the police department to shutdown the block, bring in the SWAT team, and use tear gas in a 10-hour process.

Furthermore, appellant's criminal record reflects numerous convictions from 1993 through the present crimes. This record of recidivism stretching throughout his entire adulthood demonstrates that he deserved a life sentence. (*Ewing v. California*, *supra*, 538 U.S. at pp. 29–30 [a third-strike sentence "is justified by the State's public-safety interest in incapacitating and deterring recidivist felons, and amply supported by [the defendant's] own long, serious criminal record"]; see also *People v. Sullivan* (2007) 151 Cal.App.4th 524, 571.)

Thus, we conclude that appellant's sentence does not violate either the federal or state Constitution. (*People v. Haller* (2009) 174 Cal.App.4th 1080, 1091; *People v. Romero* (2002) 99 Cal.App.4th 1418, 1433.)

Appellant's cocaine addiction does not support his claim that his sentence is cruel or unusual. (*People v. Goodwin* (1997) 59 Cal.App.4th 1084, 1094.)

---

[4]    Because we reach the merits of this issue, we do not discuss whether appellant forfeited his objection and/or whether appellant's trial counsel was ineffective for failing to assert an objection below.

Likewise, appellant's recent diagnosis with schizophrenia (after his arrest in this case) does not aid his cause on appeal. [5] While appellant claims that his behavior establishes that he was acting as a mentally disturbed person, the appellate record indicates that he was quite competent when he committed the crimes in this case. He used the "knock-knock burglary" technique to attempt to commit these crimes undetected. He pretended to be a resident when the officers contacted him at the Ramirezes' home, and he invoked his "liberties" when officers asked him to go outside. His conduct demonstrates criminality; thus, his life sentence was not cruel and/or unusual. (*People v. Boyce* (2014) 59 Cal.4th 672, 720; *People v. Poggi* (1988) 45 Cal.3d 306, 348.)

Appellant argues that there is insufficient evidence of the prior serious or violent felony conviction allegation for discharging a firearm. (§ 246.3) But, appellant admitted this prior serious or violent conviction allegation and, as such, a sufficiency claim does not lie. (*People v. Thomas* (1986) 41 Cal.3d 837, 845; *People v. Kane* (1985) 165 Cal.App.3d 480, 487.)

In urging us to reverse, appellant relies upon *People v. Golde* (2008) 163 Cal.App.4th 101. That case is inapposite. In that case, "there was no admission or evidence that [the defendant's] prior conviction was based on *personal* discharge of a firearm . . . so as to qualify as a 'serious felony.'" (*Id*. at p. 110.) In other words, the defendant did not admit to a prior serious or violent felony. (*Id*. at p. 113.) Here, the trial court advised appellant that it was alleged that he suffered three prior serious and/or violent felony convictions and that he suffered two prior burglary convictions, which were also alleged as prior serious felony convictions. Appellant admitted that he "suffered all the prior convictions that [were] read to [him]." Appellant's admission is sufficient.

---

[5] Appellant had not been taking medication for his mental illness from the time he had been released on parole for a burglary on July 5, 2013, until his arrest on September 6, 2013. Once he was arrested for these crimes, he again was prescribed medication for his mental illness.

III. *Corrections to the abstract of judgment*

The abstract of judgment indicates that appellant was convicted, in count 3, of "ATTEMPTED FIRST DEG BURGLARY, PERSON PRESENT." But, the appellate record reflects that the prosecutor struck the "person present" allegation from count 3, and the verdict form on count 3 does not have a person present allegation. Accordingly, the abstract of judgment must be corrected to delete from count 3 the "person present" language.

The abstract of judgment must also be corrected to reflect appellant's actual days in custody. He was arrested on September 6, 2013, and was sentenced on October 8, 2014, which totals 398 days. The abstract of judgment must be corrected to show 398 actual days plus 59 local conduct credits for a total of 457 credits. (*People v. Browning* (1991) 233 Cal.App.3d 1410, 1412.)

## DISPOSITION

The judgment is affirmed as modified. The abstract of judgment shall be modified to strike the "person present" language from count 3, and it shall reflect 398 actual days and 457 total credits.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, Acting P. J.
          ASHMANN-GERST

We concur:

_____, J.
         CHAVEZ

_____, J.
         HOFFSTADT

9